2005 UT App 311

**STATE of Utah, Plaintiff and Appellee,**

v.

**James Andrew NARANJO, Defendant and Appellant.**

**No. 20030677–CA.**

Court of Appeals of Utah.

June 30, 2005.

a juvenile court order on behalf of a juvenile in its custody. We leave that question for another day.

Dee W. Smith, Ogden, for Appellant.

Mark L. Shurtleff and Joanne C. Slotnik, Salt Lake City, for Appellee.

Before Judges BILLINGS, BENCH, and THORNE.

## OPINION

THORNE, Judge:

¶ 1 James Andrew Naranjo appeals from his conviction, following the denial of his motion to suppress, of possession of a controlled substance with the intent to distribute, a first degree felony. *See* Utah Code Ann. § 58-37-8(1)(a)(iii) (2002). We reverse.

## BACKGROUND

¶ 2 In the early afternoon of January 5, 2003—a Sunday between semesters—officer David Valentine of the Weber State Police Department was notified that dispatch had received a 911 call reporting that a male in a red jacket had been seen looking in vehicles that were parked in a campus parking lot. Valentine exited the campus student services building and walked to his patrol car. As he did so he saw a man—later identified to be Naranjo—wearing a red hooded sweat shirt and riding a bicycle across the parking lot. Valentine quickly got into his patrol car and attempted to catch the cyclist. After drawing near to Naranjo, Valentine sounded either the car's standard horn or his crowd control air horn to get Naranjo's attention. Naranjo stopped and Valentine shouted that he either wanted to, or needed to, talk to him. Naranjo, who was talking on a cellular phone at the time, responded that he was going somewhere and rode away. Valentine again followed Naranjo and noticed that he was riding on the wrong side of the street. He also noticed that Naranjo had a black object extending out of one of his back pockets, and that the object appeared to be metallic. He could not, however, identify the object.

¶ 3 After the pair crested a hill that leads to an area off campus, Valentine activated his emergency lights, either to stop Naranjo for riding on the wrong side of the road, to get Naranjo to talk to him, or to warn oncoming traffic of their presence on the wrong side of the road. Naranjo stopped, got off of his bicycle—leaving it lying in the road—and began walking back to the patrol car. In Valentine's words, Naranjo approached with "a steady aggressive walk toward the passenger side of my car and he's making eye contact with me at the time that he's approaching me."

¶ 4 While still seated in the patrol car, Valentine observed Naranjo reach into one of his front pockets and then remove his hand while apparently attempting to hide what he was holding. Valentine exited the patrol car and further noticed that Naranjo was still talking on the cellular phone. He also became aware that Naranjo was yelling, apparently at Valentine, but Valentine could not understand a thing that Naranjo said. As Naranjo walked up to the passenger side door of the patrol car, Valentine ordered him to show what was in his hand. Valentine was concerned because of Naranjo's "aggressive nature [in] approaching my vehicle ... and the look on his face [specifically,] he was making eye contact with me."

¶ 5 Valentine ordered Naranjo to step around to the front of the vehicle and to keep his hands where they could be seen. Naranjo complied, but he did not show his hands, and instead of stopping at the front of the car, he approached Valentine's position. Valentine drew his sidearm and ordered Naranjo to stop. When Naranjo failed to heed this order, Valentine pointed the sidearm at him. Naranjo stopped. Valentine then ordered him to show what he had in his hand. Instead, however, Naranjo started taking things from his pockets and throwing them on the ground, not in Valentine's direction, and yelling, "you want to see what I've got?" Among the items that Valentine saw Naranjo discard during this outburst was a pry bar—apparently the black object from his back pocket.[1] Valentine then ordered Naranjo to get down on his knees, which he did.

1. Valentine eventually identified several items

that were found at the scene as having been

¶ 6 Valentine ordered Naranjo to lie face down on the pavement, where he handcuffed Naranjo's hands behind his back. After noting that the black metallic object was no longer in Naranjo's back pocket, Valentine stood him up and walked him over to the side of the patrol car. There, Valentine began to frisk him. When asked during the suppression hearing why he undertook the frisk, Valentine stated that he frisked Naranjo because "[i]t's procedure. That's something I do when I'm going to handcuff somebody. That's what I'm taught." Valentine then proceeded to describe the frisk, noting first that Naranjo was essentially cooperative. When his frisk got to Naranjo's waist area, however, Valentine noticed that Naranjo was pressing his hip into the patrol car and attempting to move his handcuffed hands to his right front pocket or waistband. Rather than forcing Naranjo to comply with the search of his waist, Valentine proceeded down Naranjo's body. However, instead of patting down his right leg, Valentine lifted Naranjo's right pant leg, causing a bindle of drugs to drop to the ground.[2] He then patted down Naranjo's left leg. When he re-

discarded by Naranjo, including a cell phone, a small flashlight, a plastic case for a car stereo faceplate, a compact disk, a metal file, a screwdriver, and a bent syringe.

2. The trial court made no specific findings concerning the details of the encounter after Naranjo approached Valentine and began throwing things from his pockets. Thus, we are unable to refer to any specific factual findings concerning these events. We do have, however, Valentine's testimony and thus refer to that as our guide to the unfolding of the events.

On direct examination, Valentine testified as follows:

Q: And describe what happened as you frisked this person?
A: I stood him back up, walked him over to the side of my vehicle and started patting him down for weapons.
    . . . .
Q: Was he also doing anything with his hands at that point?
A: Yes. Even though he was in handcuffs, he had his hands around to the right side of his body and his fingertips were either in his waistband or in the front pocket area as I kept trying to pull his hands away from his pants saying, okay, show me what's in your hand as I'm trying to open the palm of his hand.
Q: And then at that point did you consider—I mean, you're patting down his waistband and his pockets. Did you pat down the rest of his pants?
A: Yes.
Q: Okay. And did you discover during that process anything that you considered to be contraband?
A: Yes, I did. . . . Out of his right pant leg fell a plastic bindle.
    . . . .
Q: What did you do then?
A: I continued on with the pat search and patted his other pant leg.
Q: What was his response to that?
A: He allowed me to pat—or pat that pant leg.
Q: At some point while you were patting him down, did he begin to move more aggressively toward you or into you?

A: He continued on pressing his hips when I got back to the pocket area, and at that point I decided to take him to the ground because obviously there was still something that he didn't want me to find.

During cross examination, Valentine's testified

Q: Okay. But you stopped him, you pulled your gun on him, you ordered him to the ground, you handcuffed him, correct? He wasn't under arrest, you had no information he had committed any crimes at that time, correct?
A: Correct.
    . . . .
Q: Not only did you frisk him, you pulled up his right pant leg and that's when the bindle fell out, correct?
A: Correct.
Q: Now that wasn't a pat-down. You were actually pulling up the pant leg to see what was there, correct?
A: I couldn't bend over far enough to safely do it so I lifted the pant leg, yes.

Later, on recross, Valentine further explained his reasons for lifting the pant leg.

Q: Why didn't you pat his pant leg?
A: Well, I'm a rather large officer with a big belly and I'm still trying to control his hands with one hand and yet still safely reach down to his ankle and I couldn't feel his ankle—
    . . . .
Q: Okay, have you been taught frisk procedures?
A: I'm an arrest control instructor, I teach that, yes.
    . . . .
Q: Of course at that time you had no reason to believe he had any weapons down there, right, you had seen no bulges around his pant leg?
    . . . .
A: No, I didn't see any bulges.
Q: What kind of shoes was he wearing?
A: I don't recall on the shoes.
Q: Well, were they boots like cowboy boots?
    . . . .
A: I'd have to go with just regular shoes[.]
Q: And regular Levi's?
A: Yes.

turned his attention to Naranjo's waist, Naranjo was still pressing his hip into the side of the patrol car, so Valentine took Naranjo to the ground. At about this time, Valentine noticed the arrival of a South Ogden police car.

¶ 7 Examining the totality of the circumstances, as we must, the incident appears to have occurred as follows: Valentine twice approached Naranjo to question him concerning the report of a car prowler. During the second encounter, Naranjo acted erratically; thus, Valentine drew his sidearm and ordered Naranjo to the ground where he handcuffed his hands behind his back, and because it was standard procedure when dealing with a handcuffed person, Valentine decided to search Naranjo. However, rather than patting him down while prone, Valentine lifted Naranjo to his feet and led him to the patrol car. Naranjo generally cooperated with the patdown, but when Valentine reached his waist, Naranjo pressed his hip into the side of the car and attempted to reach his pocket or front waistband with his handcuffed hands. Valentine became concerned that Naranjo might be concealing something around the area of his waist. He then inexplicably proceeded to lift Naranjo's right pant leg, causing a bindle to drop to the ground. Immediately thereafter, he patted down Naranjo's left leg, and only then did he turn his attention back to Naranjo's waist. However, when Naranjo continued to "resist" Valentine's search of his waist, Valentine took him to the ground.[3]

¶ 8 The South Ogden police officer who had arrived on the scene either during the time that Naranjo was taken to the ground, or just before, Sergeant Will DeHart, then took control of Naranjo while Valentine collected the items that Naranjo had thrown or dropped on the ground. The bindle was among the items collected and Naranjo volunteered that it contained heroin. He further volunteered that it was not his, but that he was delivering it to someone who was waiting nearby. Upon examination, Valentine and DeHart confirmed that the bindle contained heroin. They also determined that the main package contained three smaller bindles. Naranjo was arrested and transported to jail, where he was given his *Miranda* warnings.

¶ 9 Prior to his trial, Naranjo moved to suppress all of the evidence discovered during the encounter. The trial court denied this motion, following which Naranjo was tried by jury and convicted of possession of a controlled substance with the intent to distribute. He now appeals.

## ISSUE AND STANDARD OF REVIEW

■■■ ¶ 10 Naranjo argues that the trial court erred in concluding that his encounter with Valentine was not a violation of his Fourth Amendment rights. "[T]he ultimate question of whether a particular set of facts satisfies a given legal standard is a mixed question of law and fact." *Brigham City v. Stuart,* 2005 UT 13, ¶ 7, 519 Utah Adv. Rep. 17. However, due to our need to ensure the consistent disposition of similar cases, we review search and seizure issues for correctness, based on our examination of the totality of the circumstances. *See id.* at ¶ 8.

## ANALYSIS

■■■ ¶ 11 Naranjo presents a number of arguments concerning the validity of his encounter with Valentine and the correctness of the trial court's decision. However, because we conclude that the trial court erred in determining that the scope of Valentine's search was reasonable, we limit our review to just this question.[4]

¶ 12 Naranjo argues that Valentine's search violated his Fourth Amendment

---

3. Although the dissent assails our use of Valentine's testimony in making this decision, the trial court made no findings concerning the circumstances surrounding his decision to raise Naranjo's pant leg, thus we are forced to rely on Valentine's testimony. The dissent also suggests that a more appropriate course would be to remand for additional findings, but this seems to be contrary to the directions of *State v. Topanotes,* 2003 UT 30, ¶ 11, 76 P.3d 1159 ("In fact, we have previously held that when the State has

the burden of proof and the record on appeal fails to sustain any theory of admissibility, the State is not entitled to a remand to put on new evidence." (quotations and citation omitted)). Consequently, both the dissent's concern and its suggested alternative solution of remand are unavailing.

4. Naranjo also argues that Valentine failed to articulate facts sufficient to justify either the ini-

rights because it was not supported by probable cause, and the search went beyond the bounds of reasonability required by *Terry v. Ohio. See* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The State counters that Valentine's actions were warranted by the circumstances of the encounter and therefore, Naranjo's Fourth Amendment rights were not violated. After examining the totality of the circumstances in this case, we agree with Naranjo. We note that concluding otherwise would, in the words of Justice Douglas, result in a situation where "the police have greater authority to make a 'seizure' and conduct a 'search' than a judge has to authorize such action." *Id.* at 36, 88 S.Ct. 1868 (Douglas, J., dissenting).[5]

¶ 13 Without question, *Terry* marked the establishment of a new era in constitutional jurisprudence, one that eliminated, under certain closely defined circumstances, the requirement that police officers have probable cause to conduct a search. Specifically, in *Terry* the Court held

> When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed *and* presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to *neutralize the threat* of physical harm.

*Id.* at 24, 88 S.Ct. 1868 (emphases added).

¶ 14 However, the Court cautioned that the "necessary measures" authorized in *Terry* "constitute[ ] a severe, though brief, intrusion upon cherished personal security," and that as such they must "be strictly circumscribed by the exigencies which justify [their] initiation." *Id.* at 24–26, 88 S.Ct. 1868. Moreover, the Court further stated that the only reason such a search is permitted is to find and neutralize suspected weapons, and that the search undertaken to complete this narrow task "must therefore be confined in scope to an intrusion *reasonably designed* to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Id.* at 29, 88 S.Ct. 1868 (emphasis added). Consequently, although *Terry* does not define the physical scope of a permissible search in the absence of probable cause, it clearly identifies when such a search may be made, as well as clearly stating that the search must be narrowly tailored to do no more than blunt the exigency that permitted the search in the first place.

¶ 15 In precise terms, *Terry* states that a police officer is permitted to "search" a person that the officer reasonably believes (1) is involved in a crime; (2) is armed; and (3) is presently dangerous to the officer, the public, or the person to be searched. *See id.* at 24, 88 S.Ct. 1868. Moreover, "[a] search for weapons in the absence of probable cause to arrest ... must, like any other search, *be strictly circumscribed by the exigencies which justify its initiation*," and cannot stray into a general search for evidence of wrongdoing. *Id.* at 25–26, 88 S.Ct. 1868

---

tial encounter or the second encounter. He further argues that Valentine failed to articulate sufficient facts that would create in a reasonable person the belief that Naranjo was involved in some criminal activity, that Naranjo was armed, or that Naranjo was dangerous. Finally, he argues, assuming the State successfully demonstrated reasonable suspicion, that Valentine's search violated the permissible scope allowed under *Terry v. Ohio. See* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Taken individually or as a whole, Naranjo's argument asserts that Valentine's conduct violated the Fourth Amendment and that as a result, any evidence gathered following the violation must be suppressed. Because we reverse the trial court's decision concerning the scope of Valentine's search, we do not address the merits of Naranjo's remaining arguments.

**5.** The dissent takes great pains to point out that Justice Douglas's comments were made in his dissent to the *Terry* decision and that his dissent was to the decision as a whole. *See Terry*, 392 U.S. at 35–39, 88 S.Ct. 1868 (Douglas, J., dissenting). Although true, it is unclear what relevance this has to the impact of the quoted language. Our decision to cite this language should not be read as an attempt to import Justice Douglas's entire position, or as a veiled suggestion that we view his dissent as the correct view. Rather, like many opinions voiced in dissent, Justice Douglas raised certain valid and important points that, when viewed in the proper light, focus our attention on our role in Fourth Amendment jurisprudence. The above cited language is just one of those points, and the fact that it was articulated in dissent is of no importance.

(emphasis added). The facts of *Terry*, as well as its outcome, are instructive in highlighting the outcome of the issue before us today.

¶ 16 In *Terry*, a police officer was patrolling downtown Cleveland, Ohio, when he noticed the defendant and two other men apparently "casing" a store in preparation for a "stick-up," or daylight robbery. *Id.* at 6, 88 S.Ct. 1868. In the officer's experience, a daylight robbery indicated a high likelihood that one or more of the men might have a gun. *See id.* When the men left the area adjacent to the store, the officer followed. *See id.* When he caught up to them, he identified himself as a police officer. *See id.* at 6–7, 88 S.Ct. 1868. He asked the men their names and then quickly grabbed the defendant and spun him around, placing the defendant between himself and the other men. *See id.* at 7, 88 S.Ct. 1868. In an attempt to determine whether the defendant was armed, the officer simply patted him down. *See id.* Initially, the officer's search was limited to patting down the defendant's outer clothing. *See id.* However, when the officer felt what he believed to be a handgun in the defendant's jacket, the search became more intrusive, with the officer reaching into the defendant's clothing to confirm his suspicion. *See id.* Under these circumstances—the suspicion of an inherently violent crime and the presence of multiple suspects—the Supreme Court concluded that the search was reasonable, holding that

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and *where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety,* he is entitled for the protection of himself and others in the area to *conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.*

*Id.* at 30, 88 S.Ct. 1868 (emphases added).

¶ 17 In the instant case, we assume without deciding that Valentine's decision to search Naranjo for weapons was reasonable. Based upon this assumption, Valentine was authorized to take reasonable "necessary measures" to "neutralize" the threat posed by Naranjo. *Id.* at 24, 88 S.Ct. 1868. However, we conclude that Valentine's intrusion beyond the patting down of Naranjo's outer clothing was not justified by the threat Naranjo posed.

¶ 18 Naranjo had emptied his pockets in full view of Valentine, and although Valentine could not be certain that Naranjo's pockets were empty, he did see the black metallic object that had caused him concern drop to the ground, eliminating it as a threat. Moreover, after Naranjo's outburst was finished, Valentine had him kneel down, and then lie prone, where he handcuffed his hands behind his back. There is nothing in the record that suggests that Valentine could not, or should not, have performed the pat down at this time, rather than pulling Naranjo up to his feet, walking him to the patrol car, and leaning him against the side of the car.

¶ 19 Finally, Valentine's own characterization of his reason for raising the pant leg is belied by his subsequent actions. Valentine testified that Naranjo was pressing his hip into the car, and attempting to get his hand into the area of his front pocket. Naranjo's actions apparently made it difficult for Valentine to complete his search of the waistband area—and aroused in Valentine a suspicion that Naranjo was attempting to conceal something—thus, he moved his search to the lower part of Naranjo's body, namely his legs.[6] Valentine raised Naranjo's right pant leg—exposing his lower leg and freeing the bindle from within the pants—and then bent to pat down Naranjo's left leg. He stated

---

**6.** If Valentine was truly concerned about that Naranjo might be concealing a dangerous object in his pocket or waistband, then his decision to move his search to Naranjo's legs makes little sense. A more reasonable interpretation suggests that Valentine was not concerned that Naranjo was concealing a weapon, but instead had concluded that Naranjo was concealing contraband that could be discovered by searching Naranjo's legs.

that he lifted the pant leg because he couldn't "bend over far enough to safely do it," and because "I'm a rather large officer with a big belly and I'm still trying to control his hands with one hand and yet still safely reach down to his ankle and I couldn't feel his ankle." [7] Yet, moments later, Valentine was able to bend over with little or no concern for either his control of Naranjo's hands or his "big belly," and pat down Naranjo's left leg.[8]

¶ 20 Having reviewed the record fully, we conclude that nothing was presented that would suggest that Valentine was faced with any exigency sufficient to extend his search beyond a simple pat down. Valentine had not yet patted down Naranjo's right leg and thus he had no reason to believe that something might be secreted there. Instead, either for his own convenience or in a search for evidence of criminal activity, Valentine engaged in behavior that is best described as a search beneath clothing without probable cause to believe that Naranjo had committed a crime, and without exigent circumstances that would have otherwise permitted his actions. Consequently, we conclude that the trial court erred in concluding that Valentine did not violate Naranjo's Fourth Amendment rights.

¶ 21 As the Supreme Court has clearly stated, this court's proper role is to zealously "guard against police conduct which is overbearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires." *Terry v. Ohio*, 392 U.S. 1, 15, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). With this in mind, we reverse the trial court's denial of Naranjo's motion to suppress and remand this case directing the trial court to suppress any evidence discovered as a result of Valentine's raising Naranjo's pant leg. *Cf. Stone v. State*, 671 N.E.2d 499, 504 (Ind.Ct.

App.1996) (Darden, J., dissenting) (stating "the majority's holding in this case would seem to allow police officers to virtually cease conducting limited pat downs and instead permits them to order a strip down search under the guise of officer safety" (quotations omitted)).

## CONCLUSION

¶ 22 Valentine's conduct, specifically his decision to raise Naranjo's pant leg to look beneath the outer clothing, was unjustified in this case. In the absence of articulated facts that suggest that he was faced with an exigency that required such an action, Valentine's conduct exceeds the bounds of a reasonable *Terry* search. When Valentine raised Naranjo's pant leg, Naranjo was subdued and handcuffed. Moreover, nothing that occurred during the encounter supports a reasonable belief that Naranjo had concealed a weapon in or around his foot or ankle, or that Naranjo's conduct was such that Valentine was required to exercise control over him sufficient to justify anything beyond a simple pat down weapon search.

¶ 23 Accordingly, we reverse the trial court's denial of Naranjo motion to suppress and Naranjo's conviction, and remand for proceedings consistent with our decision.

¶ 24 I CONCUR: JUDITH M. BILLINGS, Presiding Judge.

BENCH, Associate Presiding Judge (dissenting):

¶ 25 My colleagues reverse Naranjo's conviction on the ground that Officer Valentine exceeded the permissible scope of a *Terry* search by lifting Naranjo's pant leg to visually search the ankle area. At the heart of the main opinion's conclusion that Valentine's search was impermissible under *Terry* is my

---

7. Valentine's claimed inability to control the handcuffed Naranjo during the search is disquieting, especially when Valentine's status as an arrest control instructor is factored into the situation.

8. Valentine testified that Naranjo allowed him to pat down his left leg, which he asserted explained the difference. However, although Valentine testified that Naranjo was less than cooperative concerning the pat down of his waist, he

never testified that Naranjo attempted to prevent him from patting down his right leg, rather his testimony focused on Naranjo's waist and hands. Thus, if we were to accept Valentine's rationale for his lifting of the pant leg—a need to control Naranjo's hands—logic would suggest that his reason would not suddenly dissipate moments later, allowing him to release the hands and lean over to pat down Naranjo's left leg.

colleagues' determination that Valentine was not a credible witness. Despite Valentine's testimony to the contrary, my colleagues find that Naranjo was "subdued" at the time of the search of the right pant leg.[1]

¶ 26 While it is true that we grant no deference to the trial court's application of the law to the facts in search and seizure cases, we review the district court's factual findings "under a clearly erroneous standard." *State v. Brake,* 2004 UT 95, ¶ 15, 103 P.3d 699. "The judge is the factfinder at [a hearing on a motion to suppress evidence], and as such, is the sole arbiter of the credibility of witnesses." *State v. Ballenberger,* 652 P.2d 927, 929 n. 6 (Utah 1982). Here, my colleagues reverse the district court's factual findings and credibility determinations without applying the clear error standard.[2] I dissent because my colleagues point to facts supposedly supporting the inference that Valentine lied, while ignoring facts that support the opposite inference, and then purport to decide this case as a matter of law.

¶ 27 The main opinion states that Valentine's rationale for the visual search "is belied by his subsequent actions." For example, the main opinion argues that Valentine's contention that he needed to visually inspect the right pant leg due to Naranjo's resistance must be fabricated because Valentine, moments later, was able to conduct a patdown search of the left leg. Valentine explained that a visual inspection of the left pant leg was unnecessary because Naranjo had ceased to struggle long enough to allow a patdown search of that leg. According to my colleagues, this explanation is spurious be-

cause "logic would suggest that [the need to control Naranjo's hands] would not suddenly dissipate." However, "logic would suggest" at least one possible reason why Naranjo would have ceased to struggle after the visual inspection of the right pant leg revealed the contraband: Naranjo no longer had something to conceal.[3]

¶ 28 Moreover, I am concerned about the main opinion's reliance upon dissenting opinions. The citation to the dissent of Justice Douglas in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), is particularly notable. My colleagues state that they cannot affirm Naranjo's conviction because doing so would, "in the words of Justice Douglas, . . . result in a situation where 'the police have greater authority to make a "seizure" and conduct a "search" than a judge has to authorize such action.' " (quoting *Terry,* 392 U.S. at 36, 88 S.Ct. 1868 (Douglas, J., dissenting)). According to my colleagues, their purpose in using this quote was to express a "valid and important point[ ]," not to voice support for Justice Douglas's view of the *Terry* rule. However, it is impossible to separate the "valid and important point[ ]" expressed in the quote from Justice Douglas's opposition to the *Terry* rule. That is, the law as it stands today gives the police "greater authority to make a 'seizure' and conduct a 'search' than a judge has to authorize such action" in certain situations. *Terry,* 392 U.S. at 36, 88 S.Ct. 1868 (Douglas, J., dissenting); *see also id.* at 20, 88 S.Ct. 1868 (noting that the "swift action predicated upon the on-the-spot observations of the officer on the beat . . . historically has not been, and as a practical matter could not be, subjected to

---

1. I do not "assail[ ] [the main opinion's] use of Valentine's testimony," as the main opinion asserts. Rather, I object to my colleagues' efforts to make their own findings of fact and to reweigh the district court's credibility determinations.

2. As the main opinion notes, the oral findings of the district court are somewhat sparse; nevertheless, it is quite clear that the district court evaluated and believed Valentine's testimony. However, if there is any doubt about what the district court found, the proper disposition would be to remand the case to allow the district court to clarify its findings, rather than to enter our own findings of fact. Moreover, a remand of this kind would not involve the presentation of new

evidence; thus, the rule of *State v. Topanotes,* 2003 UT 30, ¶ 11, 76 P.3d 1159, would not apply. Remanding a case for more specific findings based on the preexisting record is the proper course of action when an appellate court concludes that a district court's findings are inadequate. *See, e.g., State v. Hansen,* 857 P.2d 978, 981 (Utah Ct.App.1993).

3. The main opinion also chides Valentine for not conducting the patdown while Naranjo was prone. However, logic suggests a good reason why Valentine did not perform the patdown at that time: it would have been difficult, if not impossible, to conduct a patdown search of the areas of the body that were facing the ground.

the warrant procedure"). Under *Terry,* a police officer can conduct a search based on reasonable suspicion alone, while a judge must always have probable cause to issue a warrant. Thus, it is nonsensical for my colleagues to say the quotation is "valid and important" when they apparently concede that the idea it expresses is not consistent with the current state of the law. My colleagues may have intended the quotation of Justice Douglas to be a rhetorical flourish, devoid of legal substance. My objection to the inclusion of the quotation is that it presents a distorted picture of the true state of the law.

¶ 29 In short, viewing the facts as a whole and leaving the district court's credibility determinations intact, Valentine's inspection of the ankle area was justified as a limited intrusion reasonably designed to insure the officer's safety. *See Stone v. State,* 671 N.E.2d 499, 504 (Ind.Ct.App.1996) (holding that "extending the scope of the [patdown] to include removal of the suspect's shoes for the sole purpose to look for weapons was ... reasonable under *Terry* "). I therefore respectfully dissent.